UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF OHIO
WESTERN DIVISION

| | | |
|---|---|---|
| Mukhabbat Nuritdinova, | : | Case No. 1:13-cv-888 |
| | : | |
| Plaintiff, | : | |
| | : | |
| vs. | : | |
| | : | |
| Cincinnati Children's Hospital Medical Center, | : | |
| | : | |
| | : | |
| Defendant. | : | |

## ORDER

Plaintiff, Mukhabbat Nuritdinova, brought this lawsuit against Defendant, Cincinnati Children's Hospital Medical Center ("CCHMC"), generally alleging national origin and age discrimination.  (Doc. 1)   CCHMC hired Nuritdinova as a temporary Clinical Research Coordinator beginning in August 2012.  After approximately three months in that position, Plaintiff was informed that she would not be offered a permanent position.  She filed an EEOC claim followed by this lawsuit, which she filed pro se.

CCHMC has moved for summary judgment, arguing that the material undisputed facts establish that Plaintiff's discrimination claims lack merit.  (Doc. 27)  Plaintiff responded and attached a number of documents to her response.  (Doc. 34)  CCHMC filed a reply together with three declarations of CCHMC personnel from the department in which Plaintiff worked.  (Doc. 35)  Plaintiff then filed a "supplemental" response with additional unverified documents (Doc. 36), but she failed to seek leave of Court before filing this supplemental response.

The Magistrate Judge issued a Report and Recommendation that this Court should grant CCHMC's motion.  (Doc. 37)  In arriving at that recommendation, the Magistrate Judge declined to consider Plaintiff's supplemental response because it was filed without leave of court.  Southern District of Ohio Local Rule 7.2(a)(2) clearly states that legal memoranda other than a motion, a response, and a reply, are **not** permitted "except upon leave of court for good cause shown."  The Magistrate Judge properly disregarded Plaintiff's supplemental response.

Plaintiff has filed two sets of objections to the Magistrate Judge's Report.  (Docs. 41 and 43)  After careful review of those objections and the entire record in the case, the Court agrees with the Magistrate Judge's recommendation, and will grant CCHMC's motion.

## FACTUAL BACKGROUND

Plaintiff was born in Uzbekistan, and is a naturalized U.S. citizen.  When she filed her complaint, she was 54 years old.  Her resume states that she received her medical degree in June 1983 from the Central Asian Medical Pediatric Institution in Uzbekistan (formerly the U.S.S.R.).  She received her Ph.D. in 1995 from the Tashkent Institute of Advanced Training in Uzbekistan, and she was a Fulbright Scholar in 1999-2000 at Ohio University in Athens, Ohio.  She obtained her certification from the Educational Commission for Foreign Medical Graduates ("ECFMG"), a pre-requisite to medical licensure in the United States.  (Plaintiff's Dep Ex. 2)

Before the events giving rise to this lawsuit, Plaintiff had been applying to various residency training programs for about five years, without success.  (See Plaintiff's Dep.

Ex. 3) Plaintiff has submitted unverified copies of letters of recommendation from several physicians in the Cincinnati-Dayton area, attesting to her participation in clinical rotations and supporting her as a candidate for residency training. (See Doc. 34, Ex. 1 at CM/ECF PAGEID 613-621.) For several years, she worked as a certified medical interpreter, including providing interpretation services at CCHMC.

Dr. Sonata Jodele is a physician at CCHMC, engaged in bone marrow transplantation research. Plaintiff testified that she met Dr. Jodele when she provided interpretation services for her; sometime in April of 2012, Jodele suggested that Plaintiff apply for a position as a clinical research coordinator at Children's. (Plaintiff's Dep. at 50) Plaintiff sent an email to Jodele, expressing doubt that she had the particular experience for that position because "I've never worked in research in [the] United States." (Id. at 52) Nevertheless, apparently based on Jodele's recommendation, Plaintiff had several interviews with departmental staff members. After several months, Plaintiff testified that Susan Laupola (CCHMC Assistant Vice President, Finance and Operations, Children's Cancer and Blood Diseases Institute) told her that the hospital was "creating a position" for her to try to give her a chance. (Id. at 58) Susan Laupola "... didn't promise me that it's going to be permanent. But I asked her when she will get me permanent position. She said we will see. You will have to be -- you have to go through trainings. We will see how you perform on computer, how to do computer job, how do you get certificate and do final evaluation, then we will give you [sic]." (Id. at 60-61) Plaintiff admitted that the job she was offered was not a permanent position, but she was hoping that it would become one.

In an email dated July 16, CCHMC confirmed its offer of a temporary assignment

as a Clinical Research Coordinator, with a salary of $20 per hour, to begin August 27, 2012. (Plaintiff Dep. Ex. 6) Plaintiff started work in this temporary position on August 27, 2012, reporting to Stephanie Edwards, the Clinical Research Manager for the Bone Marrow Transplant division. Plaintiff filed an unverified copy of a position description for the Clinical Research Coordinator II ("CRC"), which lists the required skills as including excellent verbal, written and interpersonal communication skills; high clerical accuracy, attention to detail, strong organizational skills and independent work initiative; and computer literacy and working knowledge of software applications (word processing, spreadsheet and database). A Bachelor's Degree in a related field is preferred, and undergraduate experience in research desired. An Associate's Degree in a related field and 1-3 years related experience, or a high school diploma or equivalent and 2-4 years related experience is required. (See Doc. 34, Ex. 1 at CM/ECF PAGEID 605) In her declaration, Edwards summarizes the job's requirements and experience in similar fashion: "high clerical accuracy, attention to detail, strong organizational skills, computer literacy and working knowledge of software applications, word-processing, spreadsheet and database." (Doc. 27, Ex. 1, Edwards Dec. at ¶7) Edwards states that research at CCHMC is heavily regulated because it involves human subjects, and requires a large amount of paperwork. A CRC is responsible for ensuring that research protocols are followed and logistics are provided for the research doctors, all of which requires a significant amount of detailed computer work.

Exhibits 12 and 13 to Plaintiff's deposition reflect her scores on several training tests she took at the start of her employment, most of which she apparently passed. Edwards states that she and other department members tried to assist Plaintiff with

learning the job duties, but Plaintiff made mistakes during her training.  She also had difficulties using the computer and locating needed forms.  Edwards prepared a checklist to try to help Plaintiff, and she was permitted to retake at least one of the required training tests.  Towards the end of the three-month period, Edwards concluded that Plaintiff could not adequately perform the duties of a CRC.  Her computer skills were deficient, and she appeared to be more interested in the actual clinical research than in doing the coordinator's largely clerical duties.

Plaintiff testified that Dr. Jodele's attitude towards her changed as the three-month probationary period wound down; Jodele was not as nice to Plaintiff as she had been before.  Plaintiff decided to talk to Jodele, because she was concerned about some training that Stephanie Edwards did not give her, and because she was afraid she would not be hired as a regular employee.  (Plaintiff's Dep. at 64)  Jodele told Plaintiff that her skills did not match the CRC requirements and that CCHMC needed a "different mentality" for the job.  (Id. at 64-65)  Jodele also assured Plaintiff that Jodele herself would have a difficult time doing the CRC job because Jodele was a trained medical doctor, as is Plaintiff.  Plaintiff believes that the "different mentality" comment referred to her national origin because she was the only "national foreigner" in the research group.  Plaintiff believes this because Lithuania (where Dr. Jodele is originally from) is in Europe, and Uzbekistan is in Asia.   (Plaintiff's Dep. at 66)  Plaintiff admitted that Jodele knew of her background and national origin when she was first hired, and that Jodele never said anything to her about her national origin or her age.  Plaintiff testified that Stephanie Edwards always treated her well, provided her with good training, and reviewed the job requirements with her several times.  Stephanie never said or did

anything discriminatory.  (Id. at 74-75)

Plaintiff described several incidents involving a coworker, Michelle, that she believes reflected a discriminatory attitude.  Michelle once offered her food that contained pork, which Plaintiff does not eat, and then referred to the incident several times afterward.  Another time Michelle (who was pregnant at the time) put her feet up on a chair in front of Plaintiff and asked if her feet smelled; Michelle said she could not bend over due to her pregnancy.  Plaintiff found this to be offensive.  Another coworker, Melanie, befriended Plaintiff at first but then stopped talking to her because Michelle called her "a betrayer." (Id. at 105-106)  Plaintiff did not complain to anyone at CCHMC about Michelle's conduct, and Michelle left on maternity leave in early October 2012. While Plaintiff believes that Michelle did not like her and turned others against her, there is no evidence that Michelle was involved in the decision not to offer Plaintiff a permanent position.

On November 12, 2012, Plaintiff met with Stephanie Edwards and Susan Laupola, Edwards' manager, who informed her that CCHMC would not offer her a permanent job.  Edwards had discussed this decision with Laupola, Teresa Latham (the Training Coordinator for the Bone Marrow Transplant division), and with Dr. Jodele before the meeting, and all of them agreed with Edwards' decision.   According to Plaintiff, Laupola "changed my time and position as temporary."  (Id. at 134)  Laupola explained to Plaintiff that Children's decided not to hire Plaintiff for a full-time CRC position.  Plaintiff asked them to "... let me transfer to [an]other department if you don't want to work me here, if the girls [are] not comfortable ..." (Id. at 140)  Laupola told her she was "overqualified" for the CRC position but did not explain what she meant by

overqualified.   Plaintiff told them that she wanted to work on her mistakes and failures, but Laupola responded that "it's not working out."  (Id. at 142)  Plaintiff asked for a formal evaluation of her performance, as she believed that evaluation had already been scheduled.  (Id. at 165-166 and Ex. 14)  Edwards avers that because they reached a decision not to offer her a permanent job, they did not complete a formal evaluation at the end of the three month probationary period.  Plaintiff had been evaluated on a continuous basis throughout that time.

Plaintiff filed a charge with the EEOC on September 5, 2013, alleging national origin and age discrimination, and retaliation.  She claimed that she is 54 years old, Uzbekistani, and was denied a permanent position, promotion, training, benefits, and a three month evaluation.  She further claimed that she was harassed and subjected to a hostile work environment.  (Plaintiff's Dep. Ex. 16)   After she received a right-to-sue notice, she filed this lawsuit on December 4, 2013, proceeding pro se.  (Doc. 1) Her complaint generally alleges that she was discriminated against due to age and national origin; that she was bullied and ostracized by a co-worker, and retaliated against; and that Stella Davis (a physician and director of the division) "made" Laupola and Edwards fire Plaintiff to please the co-worker.  (Doc. 1 at 3)

The Court referred Plaintiff to Volunteer Lawyers for the Poor for assistance in finding a lawyer to represent her, and stayed this matter for 90 days.  VLP reported that it was unsuccessful in helping Plaintiff secure representation, and the Court informed her that she would have to proceed pro se.  (Doc. 21)   Plaintiff confirmed in her deposition that the only claims she wishes to prosecute in this lawsuit are for national origin and age discrimination.  (Plaintiff's Dep. at 171)

**DISCUSSION**

Summary Judgment Standards

The court "shall grant summary judgment if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law."  Fed. R. Civ. P. 56(a).  An assertion of a undisputed fact must be supported by citations to particular parts of the record, including depositions, affidavits, admissions, and interrogatory answers.  The party opposing a properly supported summary judgment motion "'may not rest upon the mere allegations or denials of his pleading, but ... must set forth specific facts showing that there is a genuine issue for trial.'"  Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 248 (1986) (internal quotation omitted).

The court's function is not to weigh the evidence and determine the truth of the matter, but to determine whether there is a genuine issue for trial.  Anderson, 477 U.S. at 249.  The court must assess "whether there is the need for trial — whether, in other words, there are any genuine factual issues that properly can be resolved only by a finder of fact because they may reasonably be resolved in favor of either party."  Id. at 250.  "If the evidence is merely colorable, ...  or is not significantly probative, ... the court may grant judgment."  Anderson, 477 U.S. at 249-50 (citations omitted).

The burden is on the non-moving party to "present affirmative evidence to defeat a properly supported motion for summary judgment...," Street v. J.C. Bradford & Co., 886 F.2d 1472, 1479-80 (6th Cir. 1989), and to designate specific facts in dispute.  Anderson, 477 U.S. at 250.  The party opposing the motion may not "rely on the hope that the trier of fact will disbelieve the movant's denial of a disputed fact" but must make

-8-

an affirmative showing with proper evidence in order to defeat the motion.  Street v. J.C. Bradford & Co., 886 F.2d 1472, 1479 (6th Cir. 1989).  The court must construe the record in the light most favorable to the non-movant, and draw all justifiable inferences in the non-movant's favor.  United States v. Diebold Inc., 369 U.S. 654, 655 (1962).

Plaintiff is proceeding pro se in this case, and the Court has liberally construed her pleadings with that status in mind.  However, it is beyond dispute that Plaintiff must follow the requirements of the federal statutes under which she is bringing her discrimination claims, and the requirements of the Federal Rules of Civil Procedure and the Federal Rules of Evidence.  In particular, those rules forbid any party from relying on hearsay evidence, unverified documents, and unsupported conclusions and speculation to oppose a properly supported summary judgment motion.  As the cases cited above make clear, any party (including a pro se party) opposing summary judgment must make an affirmative showing based on admissible evidence that there is a genuine factual dispute remaining for trial, in order to overcome such a motion.

Discrimination Claims

Plaintiff repeatedly asserts that she was discriminated against when CCHMC did not offer her a permanent job, and instead offered her a three-month temporary position.  CCHMC argues, and the Magistrate Judge found, that any claim based on a failure to hire Plaintiff for a permanent position is time-barred.  The Court agrees with this conclusion.  Both Title VII and the Age Discrimination in Employment Act require a plaintiff to file a claim with the EEOC no later than 300 days after the alleged unlawful discriminatory act.  See 42 U.S.C. § 2000e-5(e)(1); 29 U.S.C § 626(d)(1)(B).  On July 17, 2012, CCHMC offered Plaintiff the temporary position, and she began work on

-9-

August 27, 2012.  She filed her EEOC claim on September 5, 2013, more than 300 days after she received the offer and after she started work.   Any claim asserted in her pleadings based on a failure to offer her a permanent CRC position on July 17, 2012 is clearly time-barred.

With regard to her claims arising from her termination (or non-renewal of her temporary job) in November 2012, her EEOC claim and this lawsuit were timely filed. Discrimination claims may be established with either direct or circumstantial evidence. Plaintiff has not offered any direct evidence of national origin or age discrimination. Direct evidence is evidence which

> ... if believed, requires the conclusion that unlawful discrimination was at least a motivating factor in the employer's actions. ...  Consistent with this definition, direct evidence of discrimination does not require a factfinder to draw any inferences in order to conclude that the challenged employment action was motivated at least in part by prejudice against members of the protected group. ...  The evidence must establish not only that the plaintiff's employer was predisposed to discriminate on the basis of [national origin], but also that the employer acted on that predisposition.

DiCarlo v. Potter, 358 F.3d 408, 415 (6th Cir. 2004) (internal citations and quotations omitted).  Plaintiff believes that the incidents she describes involving Michelle, or Jodele's comment about needing a "different mentality," must have something to do with her national origin.  The factfinder in this case would be required to draw inferences in order to conclude that any of these comments or incidents were based on  her nationality or her age, and they are not direct evidence of discrimination.

Instead, Plaintiff relies on circumstantial evidence to which the familiar burden-shifting framework applies to analyze her claims.  McDonnell Douglas Corp. v. Green,

411 U.S. 792, 802 (1973). Plaintiff must first establish a prima facie claim by demonstrating that: (1) she is a member of a protected class; (2) she was qualified for her job; (3) she suffered an adverse employment action; and (4) she was replaced by a person outside the protected class, or she was treated differently than similarly situated non-protected employees. Newman v. Federal Express Corp., 266 F.3d 401, 406 (6th Cir. 2001). Establishing a prima facie claim is not intended to be an onerous task. Jackson v. FedEx Corp., 518 F.3d 388, 396 (6th Cir. 2008). If Plaintiff satisfies her prima facie case, Defendant must then articulate a legitimate, non-discriminatory reason for taking the adverse action. Unacceptable performance is a legitimate reason to terminate an employee; and this burden is one of production, not persuasion. Sjostrand v. Ohio State Univ., 750 F.3d 596, 599 (6th Cir. 2014).

Plaintiff must then show that the proffered reason is a pretext for age and/or national origin discrimination. She may do so by demonstrating that (1) the stated reason has no basis in fact, (2) the reason given is not the actual reason for the termination, or (3) the reason is insufficient to explain the adverse action. See Imwalle v. Reliance Med. Products, Inc., 515 F.3d 531, 545 (6th Cir. 2008), citing Manzer v. Diamond Shamrock Chemicals Co., 29 F.3d 1078, 1084 (6th Cir. 1994).

Prima Facie Claims

As an Uzbek-American who is 54 years old, the Court will assume that she is a member of two protected classes due to her national origin and her age. CCHMC contends that Plaintiff was not qualified for the CRC position. It argues that the temporary job was offered to try to help Plaintiff, and to allow time to evaluate whether her skills were adequate to perform the job duties. The temporary nature of the position

-11-

(and Plaintiff's admission that she knew the job was temporary) supports this argument. However, it is also the case that Plaintiff was interviewed by several members of the research department; despite their reservations about her qualifications and lack of experience, she was in fact hired even if in a temporary position.  The Court should consider Plaintiff's qualifications objectively at this stage, and may not rely on Defendant's articulated reason for its action (that Plaintiff was not qualified and could not adequately perform the job requirements).  As the prima facie burden of proof is not intended to be onerous, the Court will assume that she could show she was qualified.

As for the fourth prong of her prima facie claim, there is no evidence that Plaintiff was replaced by anyone.  Her position was temporary and did not continue beyond her three-month term.  Susan Laupola states in her declaration that Plaintiff's skill set did not match the qualifications typically required for a CRC, and that Plaintiff "would never have been considered for this position were it not for Dr. Jodele's personal reference and attempt to assist Ms. Nuritdinova."  (Doc. 35, Ex. 3 at ¶4)  But Plaintiff contends that CCHMC hired three younger, native-born American women to fill permanent CRC positions while Plaintiff worked in the department, and did not offer those positions to her.  Susan Laupola states in her declaration that CCHMC hired three new CRC's in 2013, all of them after Plaintiff left in November 2012.  All three new hires were proficient in using computer software and performing data entry, and they all had relevant significant prior experience.  Elizabeth Roberts was hired on January 7, 2013, and she had prior research experience at CCHMC and other health care facilities.  Avni Patel was hired March 18, 2013; she had prior experience in research and as a lab assistant at CCHMC.  Tashia Harris was hired August 5, 2013, with more than six years

-12-

prior experience as a clinical research assistant at another hospital.  (Id. at 8)

Plaintiff's experience and qualifications are not similar to these three individuals. In her deposition, Plaintiff admitted that she lacked one to three years experience in clinical research, performing duties of a research coordinator.  She believes that her own clinical experience in Uzbekistan was "enough," and that CCHMC should treat it as an acceptable substitute.  (Plaintiff's Dep. at 177)  Similarly, she testified that she was discriminated against based on her age when CCHMC fired her despite her medical background, and then offered permanent positions to younger women.  Plaintiff conceded that no one at CCHMC ever mentioned her age; and simply showing that a younger person was hired later for a different position is not enough.  Plaintiff must show that she was similarly situated to the younger person in all **relevant** aspects.  In this case, the salient relevant comparison is her prior experience in coordinating clinical research activities, which she admitted she lacked.  Plaintiff's subjective belief that she was similarly situated to the women who were hired later is not sufficient to satisfy her prima facie burden.

<u>Pretext</u>

But assuming that Plaintiff could establish a prima facie claim for age and/or national origin discrimination, CCHMC states that Plaintiff's job performance during the temporary three-month probationary period was inadequate, and her qualifications and skills did not match the job requirements.  She was not offered a permanent job as a result.  The burden would then shift to Plaintiff to come forward with some evidence that CCHMC's articulated reason is a pretext for discrimination.  While Plaintiff has submitted lengthy narratives describing her beliefs about her case, and quantities of

documents that are largely unverified (and some that are irrelevant), Plaintiff has not come forward with admissible evidence that raises a **genuine** factual dispute about pretext.

For instance, she repeatedly asserts that Susan Laupola and/or Stephanie Edwards and/or Dr. Jodele "promised" her a job if she passed her tests, completed classes, and finished her training period. But the only evidence of that is Plaintiff's own assertion and belief that there were enforceable promises made. In her detailed objections she suggests that Laupola's comment that "we will see how it goes," or Dr. Jodele's emails describing her ongoing research program, are evidence of an express contract between Plaintiff and CCHMC for continued permanent employment. She states that she had been applying for various positions at Children's for over three years without success. Then she was offered the temporary position; Plaintiff apparently believes that the job would automatically become a permanent one that would lead to her admission to a residency program. CCHMC's written offer, and CCHMC's witness declarations, clearly contradict Plaintiff's belief.

Later in her objections, Plaintiff notes that the job description for a CRC includes an applicant's "desire and initiative to increase knowledge and skills in clinical research," and "accept constructive feedback and use it to improve performance." (See Doc. 43, Ex. 1 at CM/ECF PAGEID #981) She contends that she met that requirement because she had the desire to increase her skills, and wanted to improve her performance in order to secure a residency. She may well have a great desire and initiative to increase her knowledge and skills. But CCHMC concluded that she did not improve her performance, and that her skill set was inadequate to perform the largely clerical,

-14-

administrative duties of the job.

Plaintiff also argues that CCHMC did not follow its own personnel policies when she was not allowed to continue beyond the initial three month probationary period; she did not receive a three-month formal evaluation; she was not given any progressive disciplinary warnings; and her son (who worked at a different institution) was given the opportunity to move beyond a probationary period in his job.  Plaintiff refers to CCHMC personnel policies in the narrative statement she filed as her "supplemental response" to the summary judgment motion, to which she attached unverified copies of several such policies.  (See Doc. 36 at 19-25, and Ex. 1 at CM/ECF PAGEID 726)  As noted above, the Magistrate Judge did not consider these materials because Plaintiff did not obtain leave of Court to file them.  CCHMC objects to any consideration by the Court of these supplemental materials because it has not had the opportunity to respond.  In the interests of justice (and noting Defendant's objection), the Court has reviewed the pages of CCHMC policy documents Plaintiff submitted.  Only one of those policies applies to "Temporary Staffing" (see Doc. 36, Ex. 1 at CM/ECF PAGEID #734-735).[1] The rest clearly pertain to permanently-hired employees.  There is nothing in the "Temporary Staffing" policy that guarantees a temporary employee any of the written evaluations, progressive discipline protections, or specific periods of probationary employment that Plaintiff believes she was entitled to receive.  (Plaintiff also submitted unverified copies of CCHMC's anti-discrimination and anti-workplace harassment policies; but she concedes that she did not report any discrimination or harassment to

---

[1] Exhibits 1 and 2 to this pleading appear to be essentially identical.

-15-

anyone at CCHMC.)

In her detailed objections (Doc. 43), Plaintiff further asserts that CCHMC failed to prove that she lacked clerical accuracy, attention to detail, or adequate computer skills. She argues that she knows how to use Excel, and states that she completed a tax preparation training course in 2013 on software that was more difficult to learn than the software at CCHMC.  These contentions may be true, but they do not establish that Plaintiff was capable of adequately performing the clerical tasks required of the CRC. Her own subjective belief in her abilities is not enough to raise a genuine dispute that CCHMC did not honestly believe that Plaintiff's skills and experience were not suited to the CRC position.  She also recites her history of contacts with CCHMC, including doing volunteer work and as a contract interpreter.  She claims that CCHMC "must" have discriminated against her because of her national origin, because CCHMC "guessed" that she was a foreigner based on her name.  She also believes that CCHMC has placed her on a "no hire" list, because she has applied for many jobs since her temporary position ended, and has not received an offer.[2]

She further asserts that she wants to offer testimony from an expert witness, and to submit a declaration from Dr. Jodele, who recommended Plaintiff for the CRC job, and knows her "well enough" to testify.  The time for disclosure of expert witnesses is long passed; and Plaintiff does not submit any resume or report from any such expert,

---

[2] Plaintiff testified that she continued to do contract work as an interpreter for CCHMC after November 2012.  She was terminated from that program in 2014 after she apparently contacted a patient at home, which is prohibited by the rules governing medical interpreters.  These subsequent events are not relevant to the Court's consideration of her discrimination claims.

nor does she explain what she believes Jodele's declaration would state or how that declaration might be relevant to showing pretext.  She repeatedly asserts that her performance in the job was satisfactory, and that CCHMC's evidence to the contrary is false, exaggerated, and biased.  Plaintiff also believes that Stella Davis discriminated against her, because Davis was not friendly and did not return her greeting when Plaintiff began work.  She believes that it was Stella Davis who decided to fire her, not Stephanie Edwards.  But she has no evidence to support that belief, which is simply based on her own speculation.  (Plaintiff's Dep. at 217-218)

    She also believes that CCHMC has challenged her mental capacities in explaining why CCHMC did not offer her a permanent position.  The Court does not view any of the pleadings or the declarations submitted by Defendant or its witnesses as suggesting any mental incapacity; to the contrary, Stephanie Edwards states that Plaintiff's prior experience and current abilities simply did not match up with the CRC's duties.  Susan Laupola states in her declaration that Dr. Jodele wanted to try to help Plaintiff, and that Laupola had reservations because "the CRC role is a significantly lower position than a doctor, which is what Ms. Nuritdinova wanted to be, with a significantly different skill set required.  Nevertheless, because we liked her and wanted to try to help her," CCHMC created the temporary position.  (Doc. 35, Ex. 3 at ¶5) She also explained that the temporary position was created to avoid the possibility that Plaintiff would have to disclose that she was terminated from a permanent job.  Teresa Latham, the Training Coordinator, states that she had to meet more often with Plaintiff than with other new employees, and that Plaintiff struggled with the technology required to do the job.  Latham did not see Plaintiff progressing to the level of competency and

independence that is normal for new CRC's.  (Doc. 35, Ex. 2 at ¶¶ 3-4)  None of these statements or observations about Plaintiff's performance should reasonably be interpreted as a challenge to Plaintiff's mental abilities, or a suggestion that Plaintiff is not competent or is unqualified for other positions in the medical field.

Furthermore, as the Magistrate Judge noted, Plaintiff admitted that no decision-maker at CCHMC discriminated against her, or displayed any kind of discriminatory animus towards her.  Stephanie Edwards approved Plaintiff's temporary position and decided not to offer her a permanent job.  Plaintiff conceded that Edwards always tried to help her, provided good training, and gave her extra assistance.  CCHMC persuasively argues that Edwards decided to invest three months of salary and training for Plaintiff, and it makes little sense to suspect that Edwards would terminate her three months later based on her age or her national origin.  The Sixth Circuit has noted that in cases "... where the hirer and firer are the same individual and the termination of employment occurs within a relatively short time span following the hiring, a strong inference exists that discrimination was not a determining factor for the adverse action taken by the employer."  Wexler v. White's Fine Furniture, Inc., 317 F.3d 564, 572 (6th Cir. 2003)(en banc).  This "same actor inference" provides additional evidence that discrimination was not the basis for CCHMC's decision.

In sum, even if Plaintiff established a prima facie claim of discrimination based on national origin or her age, the Court must conclude that she has not established a genuine factual dispute that the reasons offered by CCHMC for its action are pretextual, and that the real reason was discrimination on any basis.  The Court agrees with the Magistrate Judge's conclusion that CCHMC is entitled to summary judgment.

**CONCLUSION**

For all of the foregoing reasons, the Court overrules Plaintiff's objections and her detailed objections to the Report and Recommendations of the Magistrate Judge. (Docs. 41 and 43)  Plaintiff's motion for additional time in which to file those "detailed" additional objections (Doc. 40) is **granted**.  Her motion to file an additional brief and to bring an expert witness to a trial conference (Doc. 39) is **denied**.  The time for identifying expert witnesses is long passed and the Court will not be conducting a trial conference in this case.

Defendant's motion for summary judgment (Doc. 27) is **granted**.  Plaintiff's complaint and each cause of action contained therein is dismissed with prejudice.

SO ORDERED.

THIS CASE IS CLOSED.

DATED: June 8, 2015                    s/Sandra S. Beckwith
                                       Sandra S. Beckwith, Senior Judge
                                       United States District Court